| | | |
|---|---|---|
| MACKEAN P. NYANGWESO MAISHA, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | **VERIFIED COMPLAINT & REQUEST** |
| | ) | **FOR PRELIMINARY &** |
| THE UNIVERSITY OF | ) | **PERMANENT INJUNCTION** |
| NORTH CAROLINA AT | ) | |
| CHAPEL HILL, HOLDEN | ) | **(JURY TRIAL DEMANDED)** |
| THORP, CHANCELLOR,  WADE H. | ) | |
| HARGROVE, CHAIR BOARD OF | ) | |
| TRUSTEES, HANNAH D. GAGE, | ) | |
| BOARD OF GOVERNORS, | ) | |
| MICHAEL KOSOROK, MELISSA | ) | |
| HOBGOOD, SCOTT ZENTZ, | ) | |
| MICHAEL G. HUDGENS, | ) | |
| CHENXI LI, JASON P. FINE, | ) | |
| GARY G. KOCH, MICHAEL A. | ) | |
| HUSSEY, ALISA S. WOLBERG, | ) | |
| BAHJAT  F. QAQISH,  JOHN S. | ) | |
| PREISSER, AND JIANWAN CAI, | ) | |
| | ) | |
| **Defendants.** | ) | |

NOW COMES, Plaintiff, MacKean P. N. Maisha, complaining of the actions of the University of North Carolina at Chapel Hill and its employees, administrators, and students  and says the following:

1.      MacKean P. N. Maisha ("Plaintiff") is a resident of Durham, North Carolina and at all times relevant to this complaint a PHD candidate in Biostatistics with the School of Public Health at the University of North Carolina at Chapel Hill.

2.      Holden Thorp ("Defendant Thorp") is the Chancellor of the University of North Carolina (UNC) at Chapel Hill, Wade H. Hargrove is chair of the UNC Board of Trustees, and Hannah D. Gage is chair of the UNC Board of Governors, and are each being sued in their official capacities as such, and upon information and belief reside in North Carolina.

Case 1:12-cv-00371-CCE-LPA   Document 1   Filed 04/12/12   Page 1 of 34

3.      Michael Kosorok ("Defendant Kosorok") is a professor and chair of the Department of Biostatistics at the University of North Carolina at Chapel Hill and is being sued in his official capacity as such, and upon information and belief resides in North Carolina.

4.      Melissa Hobgood ("Defendant Hobgood") is the registrar for the Department of Biostatistics at the University of North Carolina at Chapel Hill and is being sued in her official capacity as such, and upon information and belief resides in North Carolina.

5.      Scott Zentz ("Defendant Zentz") is a member of the Information Technology support team for the University of North Carolina at Chapel Hill and is being sued in his official capacity as such, and upon information and belief is a resident of North Carolina.

6.      Michael G. Hudgens ("Defendant Hudgens") is a professor at the University of North Carolina at Chapel Hill and is being sued in his official and individual capacities as such, and upon information and belief is a resident of North Carolina.

7.      Chenxi Li ("Defendant Li") is a post-doctoral fellow with the University of North Carolina at Chapel Hill and is being sued in his individual capacities as such and upon information and belief is a resident of North Carolina.

8.      Jason P. Fine ("Defendant Fine") is a professor at the University of North Carolina at Chapel Hill and is being sued in his official and individual capacities and upon information and belief is a resident of North Carolina.

9.      Gary Koch ("Defendant Koch") is a professor with the Department of Biostatistics of the University of North Carolina at Chapel Hill and is being sued in his official and individual capacities as such, and upon information and belief is a resident of North Carolina.

10.     Alisa S. Wolberg ("Defendant Wolberg") is a professor with the Department of Pathology and Laboratory Medicine of the University of North Carolina at Chapel Hill and is

being sued in her official and individual capacities as such, and upon information and belief is a resident of North Carolina.

11.     Michael A. Hussey ("Defendant Hussey") is a doctoral student at the University of North Carolina at Chapel Hill and upon information and belief is a resident of North Carolina.

12.     Bahjat F. Qaqish ("Defendant Qaqish") is a professor at the University of North Carolina at Chapel Hill and is being sued in his official and individual capacities and upon information and belief is a resident of North Carolina.

13.     John Preisser ("Defendant Preisser") is a professor at the University of North Carolina at Chapel Hill and is being sued in his official and individual capacities and upon information and belief is a resident of North Carolina.

14.     Jianwan Cai ("Defendant Cai") is a professor at the University of North Carolina at Chapel Hill and is being sued in her official capacity and upon information and belief is a resident of North Carolina.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331 (federal question jurisdiction), 28 U.S.C. §1343(a)(3), 42 U.S. C. §1983, and 28 U.S.C. §1338(a) (jurisdiction over copyright matters).

16      Venue is proper as this complaint seek damages and injunctive relief for civil rights violations and copyright infringement occurring within the University of North Carolina at Chapel Hill in violation of the Title VI of the Civil Rights Act of 1964, the 14th Amendment to the United States Constitution, various tortious acts pursuant to the state and common laws of North Carolina,  and 17 U.S.C. § 101 et seq. All parties at the times of the acts or incidents

Case 1:12-cv-00371-CCE-LPA   Document 1   Filed 04/12/12   Page 3 of 34

giving rise to the complaint resided in the state of North Carolina and therefore venue is proper

pursuant to 28 U.S.C. § 1391(b)(c)(d) and/or 28 U.S.C. § 1400.


## FACTS

17.     Plaintiff received his Bachelors Science Degree in Mathematics and Statistics from

Egerton University in 1993 and a Masters Degree in the field of Biostatistics from Moi

University in 1996.

18.     Plaintiff also received a Masters Degree in Biometrics from the University of Nebraska at

Lincoln in 2001 and began his doctoral degree studies at Harvard University where he remained

until May of 2004. In the Fall of 2004, Plaintiff transferred to the University of North Carolina at

Chapel Hill to complete his Doctorate Degree and ultimately graduate from the University of

North Carolina at Chapel Hill ("UNC") with a PhD in Biostatistics from the School of Public

Health.

19.     During the 2004 -05 academic years, Plaintiff began to experience difficulty with

University officials in the Department of Biostatistics.

20.     In the Fall of 2005, Plaintiff was informed that he had successfully established

equivalency between his previous training and the Department's Basic Statistics training

component requirement equivalent to a UNC Masters degree after he completed and passed all

the required Masters level courses at the UNC Department of Biostatistics. Plaintiff was then

asked to request formal enrolment in the PhD program.

21.     In January of 2006, Plaintiff requested for formal enrolment in the PhD program as

directed by the Director of Graduate Admissions (DGA).

Case 1:12-cv-00371-CCE-LPA   Document 1   Filed 04/12/12   Page 4 of 34

22.     However, after Plaintiff requesting to be enrolled in the program, the DGA told Plaintiff that he was not authorized to enroll Plaintiff in the PhD program because of Plaintiff's relationship with a former chair of the Department of Biostatistics.

23.     Shortly thereafter, Plaintiff's job as Graduate Research Assistant (GRA) at the Survey Research Unit (SRU), in the Department of Biostatistics was revoked.

24.     In March of 2006, when Plaintiff inquired about the status of his PhD enrolment, the Director of Graduate Admissions told Plaintiff that the request would not be processed unless Plaintiff applied to the DrPH degree program instead of the PhD degree program.

25.     In March of 2006, Plaintiff filed a grievance with the Office of Student Affairs complaining that the former chair of the Department of Biostatistics was sending relevant final examination information to certain students to his exclusion.

26.     In Plaintiff's correspondence, he did not initially disclose that he is of African descent and the other students in question were either of Caucasian or Asian descent.

28.     Plaintiff did disclose that Professor Jianwan Cai, Interim Chair of the Department of Biostatistics was attempting to block his admission into the doctoral program for the Department of Biostatistics, as a result of his complaint against the former chair of the Department.

29.     In May of 2006, Plaintiff was admitted to the Doctoral program in Biostatistics at the School of Public Health after the Office of Student Affairs intervened.

30.     During that same period, Plaintiff took Biostatistics 263 with Professor Bahjat Qaqish.

31.     Although Plaintiff dropped this course in April of 2006, Melissa Hobgood, registrar for UNC's School of Public Health, inquired about his attendance on July 20, 2006.

32.     Professor Qaqish replied with false statements about Plaintiff to Ms. Hobgood, noting that "he is a terrible student … [who] missed many classes," as late as July 26, 2006.

Case 1:12-cv-00371-CCE-LPA   Document 1   Filed 04/12/12   Page 5 of 34

33.     When Plaintiff complained that Professor Qaqish's comments about his attendance and academic performance were untrue UNC was forced to correct the record.

34.     Plaintiff later took and successfully passed Biostatistics 263 (new UNC course code 763) under a different Professor in the Spring of 2007.

35.     During that same time period in July of 2006, Melissa Hobgood, the registrar, intentionally coded Plaintiff in the University's system as a Masters Degree student instead of a Doctoral student in Biostatistics at the School of Public Health and such designation would adversely affect Plaintiff's course selection and educational opportunities.

36.     In August of 2006, the UNC Graduate School corrected the record and properly admitted Plaintiff to the PhD program in Biostatistics at the School of Public Health.

37.     Later that year in December of 2006, Plaintiff was unilaterally changed from a PhD student to a DrPH student, a designation of a degree in Public Health, which is useful for those seeking employment in the private sector, but less prestigious than a PhD which connotes both transferrable private sector employment skills and academic prestige and scholarship especially for those interested in teaching and/or research, such as Plaintiff.

38.     In August of 2006, Plaintiff was signed up for the Applied (PhD Part II/DrPH) Doctoral Qualifying Examination, one of the required Basic Written Departmental Examinations which UNC alleges that all PhD and DrPH students must take for the Doctoral Degree in the Department of Biostatistics at the School of Public Health;  this exam is only a departmental requirement, not a general requirement necessary for PhD and DrPH candidates on a University level.

39.     The difference between the PhD Part II and DrPH Applied Doctoral Qualifying Examination is the number of questions. PhD students are required to answer any three out of

Case 1:12-cv-00371-CCE-LPA   Document 1   Filed 04/12/12   Page 6 of 34

five questions in four days whereas the DrPH students are required to answer any four out of the five questions in six days.

40.     Plaintiff had signed up for the doctoral examination as directed by University officials.

41.     However, on the day of the examination, Plaintiff could not participate in this examination because he did not receive the exam/exam materials necessary to complete the examination from the University.

42.     Melissa Hobgood the University official responsible for providing Plaintiff and all other students had equal access to exam material necessary to complete the examination intentionally and/or negligently omitted Plaintiff's name from the list of students taking the examination on August 17, 2006.

43.     As a result, on the morning of August 17, 2006, Plaintiff spent several hours requesting assistance from Professor Cai, the professor administering the examination, and Melissa Hobgood, the registrar responsible for providing Plaintiff and all other students equal access to the exam.

44.     Meanwhile, all the other students were taking the examination as Plaintiff sought to obtain the necessary materials.

45.     The examination also involved the use of data sets secured and controlled by the University at its website and available only to students with special University disclosed sign-up codes.

46.     However, on August 17, 2006, when Plaintiff sought to participate in the examination, Plaintiff could not access these data sets although Plaintiff had been assigned a sign-up code by University officials.

47.     Upon information and belief, after the other students had had time to access to the data at the given University secured "FTP" website, Scott Zentz, a University IT systems administrator,

had moved the location of the data sets to be used by the students from the given "FTP" website to a "HTTP" website, but the change was never communicated to Plaintiff, as it was to the other students taking the examination.

48.     Plaintiff spent several hours requesting assistance from Professor Cai, and Melissa Hobgood, but they still provided Plaintiff the exam with incorrect instructions about two hours after they had provided the exam to the other students.

49.     Because Plaintiff was unable to participate immediately and timely in the DrPH Qualifying Examination, he requested that he be permitted to take an MS Examination which was being offered concurrently with the applied doctoral exam, in an effort to obtain some credit while his contemporaries were taking the DrPH Qualifying Examination.

50.     After permission was granted, Plaintiff took the MS Examination and passed it.

51.     On August 18, 2006, Plaintiff found out that the University reactivated the secured "FTP" website that was given in the exam and the correct data sets had now been restored.

52.     Plaintiff then began the Applied Doctoral Qualifying Examination on evening of August 18, 2006, which was approximately 32 hours after his classmates. Plaintiff completed 4 of the 5 sections of the examination in approximately 77% of the time provided to all other students taking that examination over the 6 day period.

53.     Plaintiff requested additional time to properly complete the examination like his classmates, however, this request was declined and Plaintiff was directed to turn in his examination on the same date and within two hours after the other students.

54.     The DrPH Doctoral Qualifying Examination is alleged to be a requirement for all graduate students seeking a DrPH Doctoral Degree from the University for which Plaintiff was not, but for defendants unilateral change Plaintiff's designation.

Case 1:12-cv-00371-CCE-LPA   Document 1   Filed 04/12/12   Page 8 of 34

55.     Plaintiff turned in answers for three out of the five questions within the stipulated time.

56.     Plaintiff then turned in a fourth question as directed by University officials the next day.

57.     Professor Cai caused Plaintiff's examination to be graded on the same standard as the other students despite the fact that Plaintiff was not given the same amount of time as the other students.

58.     Upon information and belief, Professor Cai awarded Plaintiff a score of 99.5 out of a potential 200 points while the committee set the lowest passing score at 127.5 points assuming all students were tested under similar conditions thus Professor Cai awarded Plaintiff a failing grade.

59      Upon information and belief, Plaintiff was given an exam that was based on 25-points per question for a possible total of 100-points and therefore different from the exam that the other students took which according to Professor Cai was based on 50-points per question for a possible total of 200-points.

60.     Plaintiff contends that Professor Cai, who was then Chair of the Doctoral exam committee deliberately failed to properly inform members of the Doctoral exam committee about the circumstances that affected Plaintiff during the administration of Doctoral Qualifying Examination.

61.     Upon information and belief, had Professor Cai informed the members of the Doctoral exam committee of the disparity in time allotted and access to the examination and related materials by Plaintiff, a more appropriate measure of his performance would have resulted.

62.     Had Professor Cai adjusted Plaintiff's score proportionally to the actual time provided Plaintiff in relation to the time provided his classmates, Plaintiff's score would have met or exceeded the committee's set minimum passing score.

63.     Plaintiff also contends that Professor Cai's decision to secretly consult with a faculty member who was not on the Doctoral exam committee violated Plaintiff's right to anonymous grading and also created a potential conflict of interest since she and this faculty member were involved in the grading of the same exam.

64.     In the December of 2006, Plaintiff was improperly awarded a failing grade when Professor John Preisser awarded Plaintiff a score of 35 points out of a possible 50 points (70%) on Homework Number 5 in Biostatistics 765 [Applied Part].

65.     Upon learning that other students had been graded on a different scale, Plaintiff challenged the grade Professor Preisser reported on his script.

66.     Professor Preisser had to admit that Plaintiff had scored 35 points out of a possible 40 points (or 87.5%) and therefore had passed his course contrary to the initial report.

67.     Upon information and belief, it was disclosed that on the same test Professor Preisser artificially elevated the score for a Caucasian student whose actual score was 28 points out of a possible 40 (or 70%) to a score of 28 out of 35 points (or 80%) to ensure passage of the Caucasian student.

68.     In another instance, in September of 2006, a UNC official, attempted to force Plaintiff from his job as University Graduate Research Assistant (UNC-CH GRA) in the Department of Biostatistics where he is a student to take a job in a different Department.

69.     The position was with the Department of Epidemiology's Cardiovascular Disease Program to which Plaintiff had not applied.

70.     Plaintiff had neither expressed any dissatisfaction in his current position with the Biometric Consulting Lab (BCL) at his Department nor expressed/or applied for a graduate research assistant position elsewhere.

Case 1:12-cv-00371-CCE-LPA   Document 1   Filed 04/12/12   Page 10 of 34

71. Between March of 2006 and December of 2011, the actions of the University have become increasingly more hostile toward Plaintiff.

72. After completing planned course work for the doctoral degree program, in the Fall of 2008 Plaintiff chose a topic for his doctoral dissertation research and identified Professor Jason P. Fine and Professor Michael G. Hudgens to be his doctoral dissertation research advisors.

73. Professor Fine and Professor Hudgens are both Faculty members of the Graduate School of the University of North Carolina at Chapel Hill affiliated to the Department of Biostatistics in the School of Public Health dissertation.

74. Plaintiff met with his advisors in the Fall of 2008 and discussed his dissertation research plans. At the meeting Plaintiff's advisors approved the research topic and agreed on topics for the required research papers for his dissertation work.

75. After the meeting, Plaintiff began his dissertation research under the direction of Professor Jason Fine and Professor Michael Hudgens.

76. When Professor Kosorok realized that Plaintiff had identified Professor Jason Fine, who is close friend of Professor Kosorok who joined him from the University of Wisconsin after he was appointed Chair of Biostatistics Department, Professor Kosorok directed Plaintiff to work with a different faculty member.

77. On October 9, 2008, Professor Kosorok specifically directed Plaintiff to instead work with a Professor Gary Koch also a professor in the Department of Biostatistics.

78. Department practice is to allow the student the opportunity to decide which professor he wants to serve as his advisor.

79. Plaintiff chose to continue working with Professor Jason Fine and Professor Michael Hudgens because they both had previously worked on problems in the area of interest for Plaintiff.

80. Furthermore, Professor Gary Koch had previously refused to advise Plaintiff when Plaintiff complained to the University and the Office of Civil Rights (OCR) of harassment concerns by some

members of the Department of Biostatistics claiming he and Plaintiff did not have a topic of mutual interest.

81. In Spring of 2009, Plaintiff formally enrolled for BIOS994 section 054 taught by Plaintiff's advisor, Professor Jason Fine.

82. BIOS994 is the Biostatistics Doctoral Dissertation Graduate School course offered by the University of North Carolina at Chapel Hill.

83. The University of North Carolina has an online course enrollment system where all continuing students enroll for courses for the next semester.

84. Plaintiff like all other students had previously used this system to enroll for courses each semester.

85. However, when registration for Fall 2009 semester opened on April 1, 2009, Plaintiff could not enroll for BIOS994 section 054 to continue enrollment in the section taught by Plaintiff's advisor, Professor Jason Fine in the Fall of 2009.

86. Plaintiff later found out that in light of Plaintiff's decision to continue working with Professor Jason Fine and Professor Michael Hudgens instead of Professor Gary Koch as directed by Professor Kosorok, the Department deliberately changed the system to sabotage Plaintiff's ability to enroll in Professor Jason Fine's dissertation course section.

87. Upon information and belief, Professor Kosorok intentionally denied Plaintiff access to Professor Fine's dissertation course through electronic online registration.

88. On learning that Professor Jason Fine's other student advisee had successively used the online system to enroll for BIOS994 section 054, the Biostatistics Doctoral Dissertation course taught by their common advisor, Plaintiff challenged the restrictions that had been imposed on him.

Case 1:12-cv-00371-CCE-LPA   Document 1   Filed 04/12/12   Page 12 of 34

89.     Professor Jason Fine admitted that there had been restrictions placed upon him different from the other advisee.

90.     Upon information and belief, the University unsuccessfully attempted to remove the restrictions imposed before Plaintiff found out about them.

91.     Plaintiff learned of the restrictions placed upon his enrollment when he was unable to use the online course enrollment system to enroll for BIOS994 section 054 on April 1, 2009 like the other students.

92.     After fulfilling all required course work and minimum residence requirements in accordance to the University of North Carolina Graduate School guidelines, Plaintiff and his Dissertation advisors planned to have his Preliminary Oral Examination (or Prelim) in the Fall of 2009 with a graduation target of Fall 2010.

93.     However, Professor Kosorok denied Plaintiff the opportunity to take the Prelim exam.

94.     In light of the bottlenecks and unfair interferences by officials on Plaintiff's academic progress, in the Fall of 2009 Plaintiff appealed to then President Erskine Bowles and Chancellor Holden Thorp requesting the University to intervene but there was no action.

95.     In May of 2010, unlike the other students, Plaintiff was once again unable to add dissertation research credits using the online University enrollment system because Plaintiff's dissertation course section had been omitted from Fall 2010 listing of dissertation course sections.

96.     Plaintiff had to complain to the Office of the Dean of Student Affairs at the University of North Carolina before the course section was included in order for Plaintiff to continue enrollment for Fall 2010.

97.     Nevertheless, Plaintiff has successfully fulfilled and passed all required course work, satisfied the minimum residence requirements and successively earned and passed more than

twice the required minimum of six doctoral dissertation credits (more than 12- credits) to earn a doctoral degree according to the University of North Carolina Graduate School guidelines.

98.     At the University of North Carolina, doctoral dissertation research is a scientific and original project conducted by a student under the supervision of a dissertation advisor or co-advisors.

99     In the Department of Biostatistics, a doctoral dissertation is often structured into papers each representing a chapter.

100.    The doctoral research is expected to be of such scope, independence and skillful presentation as to indicate the candidate has acquired a mastery of research methodology and its application, and contributed new knowledge to the subject as indicated by the research being of the type leading to articles publishable in the Journal Biometrics, Biometrika, among others.

101.    Although, Plaintiff has been denied the opportunity to constitute a Doctoral Committee, present his Oral Examinations and finish writing his dissertation, Plaintiff successfully wrote two of the three papers each representing a chapter in his doctoral dissertation under the supervision of his co-advisors in accordance with University Guidelines and is working on third paper.

102.    Plaintiff's first dissertation paper was completed in Spring of 2010 while the second paper was in progress.

103.    In June of 2010, Professor Michael Hudgens informed Plaintiff that he was in the process of putting together the remaining part of data that had been pre-planned to be used in later sections of Plaintiff's doctoral dissertation research and that Plaintiff was to receive this data in few days in the first half of July 2010.

104.    However, in June of 2010 Professor Kosorok, the current chair of the Department of Biostatistics sent a letter to Plaintiff regarding a revised policy that would prevent Plaintiff from receiving departmental funding in the Fall.

105.    Upon information and belief, this policy was intentionally revised in retaliation for the complaint filed by Plaintiff against the Department in an effort to remove him from the program.

106.    In the letter Professor Kosorok threatened to disrupt Plaintiff's dissertation research in an effort to frustrate Plaintiff's attempts to complete his degree requirements to obtain his doctoral degree.

107.    Professor Kosorok's letter caused, Plaintiff's advisor to withhold the remaining part of the pre-planned data from Plaintiff.

108.    Each semester between the Fall of 2010 and the Fall of 2011, Plaintiff's advisors have refused to provide the data which was pre-planned to be used in Plaintiff's doctoral dissertation research.

109.    Undeterred, Plaintiff completed the second dissertation paper in Summer of 2010.

110.    In September of 2010, Plaintiff presented is second paper entitled "Parametric regression on the cumulative incidence function for interval censored competing risks data" at a seminar in Oslo, Norway.

111.    Final submission of the paper to a Journal is awaiting the remaining part of the pre-planned data which is still being with-held by Plaintiff's co-advisors.

112.    In the Fall of 2010, Plaintiff properly enrolled for doctoral dissertation credits and paid tuition.

113.    However, when Plaintiff requested to meet his co-advisors Professor Jason Fine and Professor Michael Hudgens to discuss research plans for the third and final paper, they refused to schedule any meetings as part of their advisory roles for the dissertation course.

114.    Despite sustained deliberate frustrations from the department, Plaintiff  began the final paper to constitute the summary chapter of his dissertation.

Case 1:12-cv-00371-CCE-LPA   Document 1   Filed 04/12/12   Page 15 of 34

115.    Although Plaintiff was hired purely based on his work experience, Professor Kosorok

fired Plaintiff from his UNC-CH Graduate Research Assistant (GRA) position, (a North Carolina

State Job) in January of 2011 in order to deliberately deny Plaintiff benefits; including but not

limited to: group health insurance and a tuition waiver.

116.    This has subjected Plaintiff to extreme financial and emotional distress.

117.    Usually, doctoral students who have completed planned course work at the University of

North Carolina are required to enroll in a minimum of three doctoral dissertation credits each

semester and pay tuition to maintain continuous enrolment.

118.    In order to maintain continuous enrollment as per University guidelines, Plaintiff had to

enroll for doctoral dissertation credits and had to pay tuition from his personal funds for the

Spring of 2011, using credit cards as his primary means of support.

119.    However, Plaintiff's efforts to meet his co-advisors to discuss his work were once again

denied.

120.    In March of 2011, Plaintiff reminded his co-advisors to provide him with the data but

once again the co-advisor refused to provide him with the necessary data.

121.    In April of 2011, Plaintiff informed the University of his plight and also provided the

University with a summary of his progress including a link to the online published version of his

first dissertation research paper.

122.    Upon information and belief, by June 29, 2011, after Plaintiff had provided the

University of North Carolina with above summary of his progress, one of his advisors Professor

Michael Hudgens deliberately started working on a similar research topic as Plaintiff's

dissertation work with a Caucasian student in the Department using the same data that Professor

Hudgens was withholding from Plaintiff.

123. Upon information and belief, by the Fall of 2011, Professor Hudgens and the Caucasian student were attempting to publish a paper entitled "Comparing competing risk outcomes in principal strata, with application to studies of mother-to-child transmission of HIV", which is not only similar to Plaintiff's dissertation topic but is based on the same mother-to-child transmission of HIV data that was maliciously withheld from plaintiff.

124. In the Fall of 2011, Professor Kosorok, the current Chair of the Department of Biostatistics intentionally and purposefully cancelled Plaintiff's enrollment to violate Plaintiff's continuous enrollment status in an attempt to remove Plaintiff from the program.

125. Plaintiff contends that Professor Kosorok conspired with Professors Hudgens and Fine to unethically and maliciously transfer Plaintiff's research topic which relates to statistical methods with applications to prevention trials of mother-to-child transmission of HIV data to a Caucasian student.

126. Plaintiff also contends that Professor Hudgens has deliberately been withholding the mother-to-child transmission of HIV data to maliciously delay Plaintiff's progress and to unfairly benefit the Caucasian student.

127. Plaintiff further contends that Professor Kosorok used his position as Chair of the Department of Biostatistics to sabotage Plaintiff's enrollment so that the Caucasian student could successfully take over Plaintiff's topic area and utilize this mother-to-child transmission of HIV data which had initially been pre-planned to be used in Plaintiff's dissertation and which has already been used in Plaintiff's first paper that was recently stolen.

128. Plaintiff who is African American contends that Professors Kosorok, Hudgens and Fine have discriminated him because of his race and national origin in violation of the University policy of non-discrimination.

Case 1:12-cv-00371-CCE-LPA   Document 1   Filed 04/12/12   Page 17 of 34

129.    In the Fall of 2011, Plaintiff successfully applied for a Federal student loan for the 2011-2012 academic year to urgently ameliorate the extreme financial circumstances as a result of the sudden loss of income which occurred when  Professor Kosorok  fired Plaintiff from his job and denied him all University financial support.

130.    Plaintiff urgently needed the student loan to enable him to cover  costs including, but not limited to tuition, rent, food, transport and health care costs.

131.    To ensure continuous enrollment in accordance to the UNC guidelines, Plaintiff properly and promptly enrolled for classes in the Fall of 2011 and paid his semester tuition in full.

132.    According to the University of North Carolina guidelines, in order for an enrolled student to be dropped from a course, he/she must submit a Registration/Drop/Add Form signed by both the student and the student's advisor to the University Registrar's office to request to be dropped from the course.

133.    Plaintiff neither expressed a desire or intention to drop his classes in the Fall of 2011, nor did Plaintiff submit a signed UNC Registration/Drop/Add Form to the University Registrar's office to request to be dropped from classes.

134.    To Plaintiff's surprise, in November of 2011, Plaintiff was made aware  that the Department had deliberately dropped him from all classes  for the semester.

135.    Upon information and belief, Professor Kosorok intentionally and maliciously cancelled all Plaintiffs' classes in the Fall of 2011 to purposefully violate Plaintiff's continuous University enrollment status.

136.    Professor Kosorok's deliberate actions purposefully and malicious jeopardized Plaintiff's Federal student loan status which the University unfairly withheld from Plaintiff to sabotage his ability to enroll for classes.

137. Professor Kosorok's deliberate actions further aggravated Plaintiff's financial hardships endangering his children and mother who was gravely ill.

138. Upon information and belief, during the Fall of 2011 academic semester in which Professor Kosorok sabotaged Plainitff's enrollment status, Professors Jason Fine and Michael Hudgens intentionally stole Plaintiff's dissertation research and published it online as their own work.

139. During the Fall semester of 2011, Professors Fine and Hudgens also used their positions to deliberately remove Plaintiff's name from a copy of the paper that had been submitted to a scientific journal on which they serve as associate editors and re-submitted the paper as their own.

140. Plaintiff contends that Professor Kosorok intentionally conspired to remove Plaintiff from the program to protect Professors Fine and Hudgens from any University actions for unethical violations of academic integrity associated with stealing and/or otherwise misappropriating plaintiff's work.

141. In November of 2011, Plaintiff complained to the University of North Carolina about the pattern of sustained harassment and harsh treatment by Professor Kosorok and Ms. Melissa Hobgood, the registrar.

142. Plaintiff then asked the University to restore class enrollment, but the University failed to restore Plaintiff's enrollment.

143. Plaintiff's first dissertation paper entitled "Parametric Estimation of Cumulative Incidence Functions For Interval Censored Competing Risks Data", was submitted to the *Journal Biometrics* in August of 2010 with Plaintiff as first author and his co-advisors as co-authors for their advisory role contributions.

144.    The paper was also published online in January of 2011, by the Berkeley Electronic Press.

145.    However, after Plaintiff had provided the University with a summary of his academic progress which included a link to the online publication of the first research paper hosted by the Berkeley Electronic Press, Professors Fine and Hudgens withdrew the article from the Berkeley Electronic Press website, dropped Plaintiff's name from the work and submitted the article under the same title to be published with the addition of Chenxi Li, a post-doctoral research fellow who was added to the paper after Plaintiff's paper had been published.

146.    The University not only unethically permitted Professors Fine and Hudgens to take credit for the scholarship, research and writing performed by Plaintiff during the previous three years, but the University also permitted Li to take credit for Plaintiff's work performed before Li joined the University.

147.    Whenever Professors Fine and/or Hudgens have worked with a Caucasian/Asian student advisee on a paper, the student is always accorded the appropriate credit for scholarship, research, and writing performed.

148.    However, Plaintiff has been denied proper credit for his work and therefore Plaintiff contends that he has been discriminated against because of his race and national origin in violation of University policy of non-discrimination.

149.    After Plaintiff completed and submitted the article for publication, Professors Fine and Hudgens used their positions on the Editorial Board of the *Biometrics Journal* as associate editors to unethically remove Plaintiff's name from the article, added Li, and are now attempting to publish Plaintiff's work as their own.

150.    As if the aforementioned was not enough, Plaintiff also substantially contributed to a

second article entitled, "Recumbent Factor VIIa Analog (V158D/E296V/M298Q-FVIIa,

NN1731) Enhances Fibrin Formation, Structure and Stability in Lipidated Hemophilic Plasma."

151.    In August of 2010, Plaintiff's name was second on the paper behind Laura D. Gray of the

Department of Pathology and Laboratory Medicine for his significant contribution to the paper.

152.    Although the article was received by the *Thrombosis Research Journal* in October of

2010 with Plaintiff identified as an author from the Department of Biostatistics, it was revised

and Plaintiff's name and attribution was dropped and Michael Hussey, a Caucasian graduate

student within the Department of Biostatistics was improperly given attribution for the work

performed by Plaintiff, in violation of University policies and principals of academic integrity.

153.    Each semester between the Fall of 2010 and the Spring of 2012, the registrar has

repeatedly attempted to drop Plaintiff from courses in which he was properly enrolled in an

effort to violate Plaintiff's continuous enrollment requirement in order to deliberately jeopardize

Plaintiff's Graduate student status at the University of North Carolina.

154.    On December 17, 2011, when Plaintiff realized that his work had been stolen, he wrote a

letter to the University of North Carolina to protest the unethical actions of Professors Fine,

Hudgens and Professor Kosorok, the Chair of the Department of Biostatistics.

155.    Shortly thereafter, Plaintiff realized that his student account including email access had

been disabled.

156.    Unable to login the University online enrollment system, Plaintiff asked the Department

of Biostatistics to enroll him for the Spring of 2012.

157.    Plaintiff was told that he was no longer a student in the Department of Biostatistics.

158.    In January of 2012, Plaintiff was told by the Graduate School that Professor Kosorok had

discontinued him from the program.

159.    Plaintiff contends that Professor Kosorok acted in retaliation for Plaintiff's effort to bring to light improprieties at the Department of Biostatistics and to curtail due process.

160.    Plaintiff has not only written research papers, but his research methodology, application, and contribution to the subject area is the basis of the primary statistical analysis for an original article "Bone-Density Testing Interval and Transition to Osteoporosis in Older Women" which appeared in the January 2012 issue of the *New England Journal of Medicine* (NEJM.

161.    Plaintiff's contribution to the subject area was also featured in the Special Issue Paper "Competing risks and the clinical community" which appeared in the August 4, 2011 issue of the *Journal Statistics in Medicine*.

162.    Plaintiff's doctoral dissertation research work clearly demonstrates a mastery of the research methodology and its applications, and is a contribution of new knowledge consistent in scope and content to the requirements of a doctoral degree at the University of North Carolina.

163.    Between 2006 and 2010, approximately 94.6% of all Caucasian students passed the Doctoral Qualifying Examination while only 85.7% of African American students passed the exam during the same period.

164.    More specifically, in 2006 when Plaintiff took the original examination, only 50% of the African American students passed the examination as compared to 100% of the Caucasian students.

165.    Simply put the odds of African American students failing the DrPH Qualifying Examination between 2006 and 2010 is almost 3 times the odds of failing the exam among their white classmates.

166.    Overall, of the 55 doctoral dissertations submitted throughout the entire Department of Biostatistics only four (4) were from African American students between 2006 and 2010.

Case 1:12-cv-00371-CCE-LPA   Document 1   Filed 04/12/12   Page 22 of 34

167.     All but one of those four dissertations was supervised by the lone African American professor within the Department of Biostatistics.

168.     More telling is that during that same period only one African American was conferred a PHD in Biostatistics between the period 2006 and 2010.

169.     The University has consistently advised Plaintiff that they have never waived any portion of the qualifying examination for any student seeking a doctoral degree.

170.     However, upon information and belief, a Caucasian student, Laura Lapkauskaite, was permitted to sit for her final oral presentation in October of 2011, without successfully passing the qualifying examination.

171.     In short, the University of North Carolina at Chapel Hill School of Public Health, Biostatistics Department, has established a pattern and practice of discrimination, discouragement, and steering of African American students away from the PHD program into less popular advanced studies for the last six years and this pattern and practice has adversely affected Plaintiff's educational opportunities.

172.     Plaintiff files this complaint in attempt to redress the discriminatory actions of Defendants, as he has exhausted all of his administrative remedies and been informed by the University that he must complete the DrPH Qualifying Examination by the Fall of 2012 or be dismissed from the program.

173.     The aforementioned actions of the University are contrary to the policies applicable to doctoral (PHD) students who must merely pass such an exam before they graduate and have up to eight years from the date of admission into doctoral program to graduate.

174.     By the Fall 2012, Plaintiff would have completed less than six years since entering doctoral program.

175.    The University of North Carolina at Chapel Hill through Professor Kosorok and others have constantly been made policies which target and systematically deny Plaintiff equal access to a public education.

176.    Plaintiff seeks redress for the aforementioned acts of retaliation and discrimination.

## COUNT ONE:
## VIOLATION OF EQUAL EDUCATIONAL OPPORTUNITY
## (PURSUANT TO TITLE VI OF THE CIVIL RIGHTS ACT OF 1964, THE EQUAL EDUCATIONAL OPPORTUNITIES ACT OF 1974, AND THE 14TH AMENDMENT TO THE U.S. CONSTITUTION)

177.    Plaintiff hereby incorporates paragraphs 1-176 by reference.

178.    Plaintiff is a member of a protected class, African Americans and/or persons of African descent with a national origin of , Africa.

179.    The activities of Defendants in the administration of the DrPH Qualifying Examination in 2006; and  in December of 2011 where it removed Plaintiff's name from the research and paper submitted and substituted a student of Asian descent to take credit for the work done by Plaintiff, and thereafter have and continue to improperly discriminate and adversely impact the educational opportunities of Plaintiff when compared to his Caucasian counterparts seeking a PHD from the Biostatistics Department.

180.    Plaintiff is otherwise qualified to complete and received his PHD, but for the discriminatory acts described above.

181.    Plaintiff has been harmed by Defendants discriminatory actions in that he has been unable to complete his pursuant of a PHD in Biostatistics.

181.    Said harm to Plaintiff has damaged him financially in excess of $75,000.00.

## COUNT TWO:
## INTENTIONAL DISCRIMINATION

Case 1:12-cv-00371-CCE-LPA   Document 1   Filed 04/12/12   Page 24 of 34

**(PURSUANT TO THE 14TH AMENDMENT TO THE U.S. CONSTITUTION)**

182.    Paragraphs 1-181 are reincorporated by reference.

183.    Plaintiff is of African dissent.

184.    Plaintiff has been subject of intentional discrimination by Defendants; To name a few: Defendants have intentionally discriminated Plaintiff in the administration of the 2006 test; the intentional steering of Plaintiff out of the PHD program and into the DrPH program in Biostatistics; the intentional and repeated reporting of fraudulent failing grades which Plaintiff had not earned; the improper attribution of his dissertation research to Caucasian and Asian students, the most recent of which occurred in December of 2011; the failure to offer Plaintiff a waiver of the DrPH Qualifying Examination as it did for a similarly situated Caucasian classmate during the same time in which it denied such a waiver to Plaintiff; the constant dropping of dissertation classes for Plaintiff in an attempt to prevent Plaintiff from finishing his PhD requirements within the Department, most recent of which occurred in the Fall of 2011 semester; enacting the revised policy in retaliation to Plaintiff's complaints and requests for equal treatment; and the retaliation for Plaintiff complaining about the Department of Biostatistics interim chair's attempt to block his admission into the PHD program despite Plaintiff's previous academic credentials.

185.    These intentional acts of discrimination are in violation of the Fourteenth Amendment to the United States Constitution, the Law of the Land Clause of the North Carolina Constitution, and Title VI of the Civil Right Amendment of 1964, 42 U.S.C. § 2000(d) et seq., because Defendant University of North Carolina at Chapel Hill is a recipient within the meaning of the Act.

186.    Said acts of discrimination have damaged Plaintiff in excess of $75,000.00.

**COUNT THREE:**

**DISPARATE IMPACT**

187.     Paragraphs 1-186 are reincorporated by reference.

188.     Defendant UNC's, disparate treatment as alleged above of PHD candidates of African dissent on the basis of race and/or national origin in the Department of Biostatistics adversely impacted Plaintiff.

189.     Plaintiff is of African descent and a citizen of the United States with a national origin in Africa.

190.     Defendant UNC's pattern and practice of discouraging, frustrating, and/or otherwise failing students of African descent on the basis of race and/or national origin, including Plaintiff, in the Department of Biostatistics from obtaining PHD's is violative of federal law.

200.     Defendant UNC's pattern and practice of discouraging, frustrating, and/or otherwise attempting to fail Plaintiff between 2006 and 2011 has violated Plaintiff's right to be free from educational discrimination on the basis of his race and/or national origin.

201.     Defendant UNC's actions have harmed Plaintiff personally and professional resulting in damages in excess of $75,000.00..

**COUNT FOUR:**
**COPYRIGHT INFRINGEMENT**

202.     Paragraphs 1-201 are reincorporated by reference.

203.     Defendants UNC, Hudgens, Fine, Li, and Hussey, have violated the copyright infringement laws of the United States of America found at 17 U.S.C. § 101 et seq.

204.     The aforementioned Defendants with the University's assistance and approval improperly converted the research and writings of Plaintiff to their own and caused the same to be published in various journals without the consent or proper attribution to Plaintiff.

205.    Said actions has severely hampered Plaintiff's ability to present part one and part two of his dissertation as required for the receipt of his PHD.

206.    Plaintiff's damages resulting from the copyright infringement are ongoing and in excess of $75,000.00.

## COUNT FIVE:
## PLAGERISM AND VIOLATION OF ACADEMIC INTEGRITY POLICY

207.    The allegations in paragraphs 1-206 are hereby reincorporated by reference.

208.    The actions of Defendants Li, Hussey, Fine, and Hudgens, violate the University's policies of plagiarism and academic integrity in that they converted the work of Plaintiff to their own use without the consent or attribution of Plaintiff.

209.    Said actions have harmed Plaintiff.

210.    Plaintiff has been damaged by the aforementioned acts of plagiarism and violations of academic integrity in an amount in excess of $75,000.00.

## COUNT SIX:
## BREACH OF EMPLOYMENT CONTRACT

211.    The allegations in paragraphs 1-210 are hereby reincorporated by reference.

212.    Plaintiff was employed by the University of North Carolina at Chapel Hill as a graduate assistant, pursuant to a contractual agreement.

213.    Plaintiff paid tuition to Defendant University in the 2010-2011 and 2011-2012 academic years as consideration.

214.    Defendant University accepted the tuition payment for enrollment in academic courses during the same period.

215.    Plaintiff received his employment with Defendant University as a work-study option as a result of the contractual agreement in which Defendant University accepted tuition.

216.    As a result of the work-study arrangement, Defendant University is required to treat Plaintiff in a fair and equal manner consistent with University policies, in addition to state and federal law requirements as this contract extends to reap the benefits of such policies and procedures.

213.    Professor Kosorok caused Plaintiff to be terminated from his employment without good cause and for an improper purpose, in violation of the terms of the contractual agreement.

214.    Plaintiff lost the income and benefits associated with the graduate assistant position, including but not limited to group healthcare insurance benefits, cost of living, and tuition assistance.

215.    Plaintiff has suffered financial damages as a result of the lost income and benefits due to Defendant University's breach in excess of $75,000.00.

**COUNT SEVEN:**
**BREACH OF STUDENT-UNIVERSITY CONTRACT**

216.    Paragraphs 1-215 are reincorporated by reference.

217.    Plaintiff paid tuition to Defendant University in the 2010-2011 and 2011-2012 academic years as consideration.

218.    Defendant University accepted the tuition payment for enrollment in academic courses during the same period.

219.    Defendant University unilaterally un-enrolled Plaintiff from courses and failed to reimburse Plaintiff for the costs associated with the un-enrollment in breach of the contractual relationship between the University and Plaintiff.

220.    According to the University of North Carolina guidelines, in order for an enrolled student to be dropped from a course, he/she must submit a Registration/Drop/Add Form signed by both

the student and the student's advisor to the University Registrar's office to request to be dropped from the course.

211.    Plaintiff neither expressed a desire or intention to drop any of the courses in the 2010-2011 and 2011-2012 academic years, nor did Plaintiff submit a signed UNC Registration/Drop/Add Form to the University Registrar's office to request to be dropped from classes for the courses he was unilaterally removed from in the 2010-2011 and 2011-2012 academic year.

220.    Plaintiff has been damaged by the loss of the tuition paid for academic years 2010-2011 and 2011-2012.

221.    Plaintiff seeks to recover the tuition and fees paid during that period, and other associated damages which result from the breach herein in an amount in excess of $75,000.00 .

**COUNT EIGHT:**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

222.    Paragraphs 1-221 are reincorporated by reference.

223.    Defendants conduct is  extreme and outrageous; to name a few, Defendants have: continuously dropped Plaintiff from classes to which he had enrolled; have fired Plaintiff from his graduate assistant position without cause and in retaliation against him; have plagiarizied and published his research without his consent; have unilaterally changed his degree from PhD to DrPH; have removed Plaintiff as a student to which a degree can be conferred upon as recent as December 2011; and have discriminated and retaliated against Plaintiff as a result of seeking redress through  lawful complaints about disparate treatment, discrimination, and other unlawful acts that Defendants' conduct has  caused, and continues to cause Plaintiff severe emotional distress.

224. Defendants' actions did in fact cause Plaintiff severe emotional distress, in the form of extreme anxiety, sleeplessness, and undue worry with respect to completion of his doctoral degree and future employment prospects.

225. Damages for this matter are in excess of $75,000.00.

## COUNT NINE:
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

226. Paragraphs 1-225 are reincorporated by reference.

227. The conduct of Defendants, was so negligent, in dropping Plaintiff from classes to which he had enrolled, firing Plaintiff from his graduate assistant position without cause, plagiarizing and publishing his research without his consent, and discriminating and retaliating against Plaintiff when he made lawful complaints about disparate treatment that Defendants' conduct was reasonably foreseeable to cause Plaintiff severe emotional distress.

228. Defendants' actions did in fact cause Plaintiff severe emotional distress, in the form of extreme anxiety, sleeplessness, and undue worry with respect to completion of his doctoral degree and future employment prospects.

229. Damages for this matter are in excess of $75,000.00.

## COUNT TEN:
## PRELIMINARY INJUCTION AND PERMANENT INJUNCTION
## (PURSUANT TO 28 U.S.C § 1343(a)(3))

230. Plaintiff hereby realleges paragraphs 1-229 by reference.

231. Plaintiff seeks a preliminary and permanent injunction requiring Defendant UNC to re-enroll Plaintiff in the PHD program for the Department of Biostatistics, and requiring Defendants to immediately remove all acts of plagiarism referred to herein and put the works back to their

original condition for publications purposes, and desist from further actions of plagiarism of Plaintiff's works.

232.    Plaintiff has spent approximately six years progressing toward the completion of his PHD degree and if Defendant UNC is permitted to deprive Plaintiff of the opportunity to complete said PHD degree after substantial work has been accomplished toward this educational goal Plaintiff shall suffer irreparable harm.

233.    A preliminary injunction should be granted directing UNC to re-enroll Plaintiff in his dissertation courses.

234.    A permanent injunction should be granted enjoining Defendant UNC from taking action that would prevent Plaintiff from obtaining his PHD.

        WHEREFORE, Plaintiff respectfully requests that this Court enter an order:

1.      That Defendants have engaged in acts of discrimination against Plaintiff in the administration of the 2006 DrPH Qualifying Examination;

2.      That Defendants have treated Plaintiff differently to similarly situated specifically identified Caucasian PHD candidates in the Biostatistics Department;

3.      That Defendant UNC is enjoined from requiring Plaintiff to take the DrPH Qualifying Examination, and from removing Plaintiff's name from research and articles prepared by him;

4.      That Plaintiff have and recover damages in excess of $75,000 as determined at trial from Defendant UNC for said acts of discrimination, both intentional and disparate;

5.      That Plaintiff have and recover damages from Defendants UNC, Hudgens, and Fine for the copyright infringement of Plaintiff papers in 2010 and 2011 in amounts of $75,000 each;

6.      That Plaintiff have and recover damages from Defendant UNC for the breach of the employment contract;

7. That Plaintiff have and recover damages from Defendant UNC for the breach of the student –university contract associated with tuition and fees for 2010 through 2011;

8. That Plaintiff have and recover damages from all Defendants, jointly and severally, for intentional infliction of emotional distress;

9. That Plaintiff have and recover damages from all Defendants, jointly and severally, for negligent infliction of emotional distress;

10. That a preliminary and permanent injunction should issue against Defendant UNC preventing it and its employees from unilaterally un-enrolling Plaintiff from the PHD program within the Department of Biostatistics or otherwise treating him differently from Caucasian students;

11. That a preliminary and permanent injunction should issue against Defendants to immediately remove all acts of plagiarism referred to herein and put the works back to their original condition for publications purposes, and desist from further actions of plagiarism of Plaintiff's works;

12. That Plaintiff have and recover attorneys fees for the prosecution of this action; and

13. Such other and further relief as the Court deems just and proper.

14. Plaintiff hereby requests a trial by jury.

This the 12th day of April, 2012.

Bowens Law Group, PLLC

/s/Stephon J. Bowens
Stephon J. Bowens
NC State Bar No. 20876
Saleisha N. Williams
NC State Bar No.
3434 Edwards Mill Road, Suite 112-254
Raleigh, North Carolina 27612
(919) 741-6798 Office
(888) 686-0456 Facsimile

Case 1:12-cv-00371-CCE-LPA   Document 1   Filed 04/12/12   Page 32 of 34

stephon@bowenslawpllc.com
saleisha@bowenslawpllc.com
*ATTORNEYS FOR PLAINTIFF*

Page **33** of **34**

**VERIFICATION**

I, MacKean P. N. Maisha, the Plaintiff in the above-entitled action hereby verify that I have read the contents of the foregoing Complaint. I further verify that all the matters alleged in the Complaint are true to the best of my knowledge and are averred to upon my information and belief otherwise. I am above the age of eighteen (18) years. Furthermore, I understand that a false statement in a Verified Complaint may subject me to penalties of perjury.

This the _15_ day of _March_____, 2012.

_____
MacKean P. N. Maisha

STATE OF _Norway_____
COUNTY OF _Norway_____

The foregoing Complaint was acknowledged before me this _15_ day of
_March_____, 20_12_, by MacKean P. N. Maisha, who is personally known to me or produced identification and whom took an oath or affirmed.

_____       **Pål Ness**
Notary Public                                            **Advokat**

My Commission Expires: _____