IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| MACKEAN P. NYANGWESO MAISHA, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | 1:12-CV-371 |
| THE UNIVERSITY OF NORTH CAROLINA, et al., | ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Catherine C. Eagles, District Judge.

The plaintiff, Mackean P. Nyangweso Maisha, sued the University of North Carolina and several UNC professors and officials over his treatment while a graduate student at UNC. Mr. Maisha's remaining claims are a Title VI claim against UNC based on racial and national origin discrimination and § 1983 claims and emotional distress claims against Professor Jason Fine and Professor Michael Hudgens. Because Mr. Maisha has not presented sufficient admissible evidence to support any of his claims, the Court will grant the defendants' motion for summary judgment.

## FACTS

### Background

In summarizing the relevant facts, the Court views the evidence in the light most favorable to the non-moving party, Mr. Maisha. The Court has not considered "facts" set forth in the briefs that are not supported by citations to admissible evidence.

Mr. Maisha repeatedly cites the amended complaint as evidence of the "facts" stated.[1] (*See generally* Doc. 64.) Unless the defendants admitted the alleged fact in their answer, (Doc. 26), the Court has not considered unverified statements in the amended complaint. (Doc. 14.) These allegations are not under oath and are not evidence. *Higgins v. Scherr*, 837 F.2d 155, 156-57 (4th Cir. 1988). Nor has the Court considered inadmissible hearsay, as indicated in the Court's Order granting in part the defendants' motion to strike. (Doc. 72.)

The Court also has not considered exhibits Mr. Maisha submitted with his substitute brief. (*See* Doc. 64-1.) The Order allowing Mr. Maisha to submit a substitute brief did not allow him to submit additional evidence. (*See* Doc. 63.) To consider this evidence would be to reward Mr. Maisha for violating the Local Rules, *see* L.R. 7.3(f), (g), and would be unfair to the defendants, who wrote a reply brief based on the evidence originally submitted. Therefore, the Court strikes the exhibits Mr. Maisha filed with his substitute brief at Docket 64-1.

Finally, the Court will not scour the record—which, even as limited above, constitutes hundreds of pages—to find evidence to support or refute a party's factual statements. *See Stephenson v. Pfizer Inc.*, No. 1:13cv147, 2014 WL 4410580, at *1 n.1 (M.D.N.C. Sept. 8, 2014) (noting that the Court has no obligation to "investigat[e] the basis of claimed facts"); *Hughes v. B/E Aerospace, Inc.*, No. 1:12CV717, 2014 WL

---

[1] While the defendants occasionally did this as well, (*see* Doc. 44 at 3-4), those "facts" were generally background in nature. The defendants overwhelmingly supported their factual assertions with specific and accurate citations to admissible evidence.

906220, at *1 n.1 (M.D.N.C. Mar. 7, 2014) ("A party should not expect a court to do the work that it elected not to do."); *see also Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (noting that "a court is not required to scour the record in search of evidence to defeat a motion for summary judgment" (internal quotation marks omitted)). While the Court has relied on the parties to direct the Court's attention to the relevant evidence, the Court has accepted the actual evidence and not the parties' characterization of that evidence, which, in Mr. Maisha's case, is often inaccurate and exaggerated.

Finally, the Court has recited only material facts. There are some disputed facts related to Mr. Maisha's tenure as a UNC student, but they are irrelevant to the matters at issue. The Court has examined all the proffered evidence carefully but sees no need to include a complicated review of Mr. Maisha's academic career when that review would serve no purpose.

## Undisputed Facts

It appears undisputed that Mr. Maisha[2] is a black man originally from Africa.[3] He was a graduate student in the DrPH program in UNC's Biostatistics Department in May 2006. (Doc. 43-26 at 17.) DrPH students must pass the "Qualifying Exam" within their first four years and must pass it before beginning dissertation research. (Doc. 43-1 at ¶ 32; Doc. 43-24 at 153-54, 165; Doc. 43-25 at 8-9.) Mr. Maisha failed the Qualifying

---

[2] During the events at issue, the plaintiff appears to have gone by the name Peter Nyangweso. (*E.g.*, Doc. 53-1 at 1, 3; Doc. 54 at 3-6; Doc. 54-1 at 1.) The Court will refer to him by the name he used in the complaint. (*See* Doc. 1.)

[3] Neither party provided a clear citation to evidence of this fact, but as best the Court can tell it is undisputed.

3

Exam in August 2006 due to administrative errors by UNC, (Doc. 43-1 at ¶¶ 14-15; Doc. 43-17 at 6), so UNC agreed to "re-start the clock" on Mr. Maisha's deadline to pass, giving him until the fall of 2012, rather than the fall of 2010. (Doc. 43-25 at 8-9; Doc. 53-1 at p. 18 ¶ 38.) As of the fall of 2010, Mr. Maisha had not passed the Qualifying Exam. (Doc. 43-1 at ¶ 50; Doc. 43-5 at ¶ 24; Doc. 43-7 at ¶ 21.)

Dr. Michael Kosorok, Chair of the Biostatistics Department, allowed Mr. Maisha to conduct "informal dissertation research" with Professors Fine and Hudgens as he prepared for the Exam. (Doc. 43-1 at ¶ 31; Doc. 43-5 at ¶ 12; Doc. 43-7 at ¶ 8.) In 2008, the professors and Mr. Maisha picked a research topic, and Mr. Maisha began contributing to Professor Fine's HIV research. (Doc. 43-5 at ¶¶ 13-14; Doc. 43-7 at ¶¶ 9-10, 15.) The professors told Mr. Maisha several times that he must take and pass the Qualifying Exam in August 2010 or they would not continue to work with him on research. (Doc. 43-5 at ¶¶ 16-22; Doc. 43-7 at ¶¶ 14-20.) Several times the professors and Dr. Kosorok reminded Mr. Maisha of the Exam and offered to help him prepare. (*See* Doc. 43-5 at ¶ 20; Doc. 43-7 at ¶ 18; Doc. 43-20 at 1, 3; Doc. 43-1 at ¶ 47; Doc. 43-24 at 198-200.) Mr. Maisha did not take the August 2010 Exam, (Doc. 43-1 at ¶ 50; Doc. 43-5 at ¶ 24; Doc. 43-7 at ¶ 21), and Professor Fine told Mr. Maisha that he and Professor Hudgens would no longer work with him. (Doc. 43-24 at 201.)

Mr. Maisha registered for BIOS 994, a dissertation-level research class taught by Professor Fine, for the Fall 2010 semester. (Doc. 43-7 at ¶¶ 11, 27.) Students must have passed the Qualifying Exam to take BIOS 994. (Doc. 43-1 at ¶ 43; Doc. 43-7 at ¶ 27; Doc. 43-25 at 8-9.) Even though Mr. Maisha was not eligible to take the course,

4

Professor Fine gave Mr. Maisha a passing grade because he "felt sympathy for him and wanted to give him time to figure out his next steps." (Doc. 43-7 at ¶ 27.)

Though he still had not passed the Qualifying Exam, Mr. Maisha again registered for BIOS 994 for the Spring 2011 semester. (Doc. 43-7 at ¶ 28.) In January 2011, Professor Fine told Mr. Maisha this was inappropriate. (Doc. 43-23 at 1.) In March, Mr. Maisha emailed Professor Hudgens and requested more data for his research, (Doc. 43-20 at 7), and Professor Hudgens reminded Mr. Maisha that he and Professor Fine were no longer his research advisors and that he should not continue working on the study. (Doc. 43-19 at 1.) Mr. Maisha did not drop BIOS 994 by the deadline, and Professor Fine gave him a grade of "Incomplete." (Doc. 43-7 at ¶ 28; Doc. 43-23 at 3.)

Mr. Maisha again registered for BIOS 994 for the Fall 2011 semester. (Doc. 43-7 at ¶ 29; Doc. 43-23 at 3.) In September 2011, Professor Fine told Mr. Maisha to drop the course because he did not have permission to take it. (Doc. 43-7 at ¶ 29; Doc. 43-23 at 3.) Professor Fine reminded Mr. Maisha that he had a grade of "Incomplete" for Spring 2011 BIOS 994 and said the grade would automatically become a failing grade if Mr. Maisha did not contact him. (Doc. 43-23 at 3.) Professor Fine cautioned Mr. Maisha that he might lose his graduate-student status if this happened. (Doc. 43-7 at ¶ 29; Doc. 43-23 at 3.)

The University administratively dropped Mr. Maisha from Fall 2011 BIOS 994 on September 14, 2011. (Doc. 43-21 at 6, 7.) For reasons not clear from the record, Mr. Maisha was not administratively dropped from Spring 2011 BIOS 994 until sometime in Spring 2012. (Doc. 43-1 at ¶ 55; Doc. 43-23 at 4; Doc. 43-21 at 3-5.)

5

Graduate students at UNC must register for a minimum number of credit hours per semester to remain enrolled. (Doc. 43-4 at ¶ 3; Doc. 43-16 at 27.) In September 2011, once Mr. Maisha was dropped from Fall 2011 BIOS 994, he was not registered for enough hours to remain enrolled at UNC, which also meant he was no longer eligible for financial aid. (Doc. 43-4 at ¶¶ 3-6; Doc. 43-8 at ¶ 12; Doc. 43-16 at 27.)

Mr. Maisha was not required to take BIOS 994 to remain a graduate student. (*See* Doc. 43-16 at 27; Doc. 43-1 at ¶ 56; Doc. 43-4 at ¶ 6.) He was eligible to take other courses in 2011, but it does not appear that he did. (Doc. 43-1 at ¶ 56; Doc. 43-4 at ¶ 6; Doc. 43-21 at 3.) Instead, from August 1, 2010, until July 2013, Mr. Maisha was enrolled in a graduate program in mathematics at the University of Oslo, where he was also employed full-time. (Doc. 43-10.)

The Court will address additional undisputed facts as the need arises.

## ANALYSIS

### I. Title VI Claim

Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."[4] 42 U.S.C. § 2000d. To recover for a Title VI violation, a plaintiff must demonstrate intentional discrimination, *see Alexander v. Sandoval*, 532 U.S. 275, 280 (2001), by either presenting direct evidence of racial or national origin discrimination

---

[4] In its answer, UNC admitted that it received federal financial assistance. (Doc. 26 at ¶ 179; *see also* Doc. 14 at ¶ 179.)

or proceeding under the burden-shifting scheme in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Middlebrooks v. Univ. of Md.*, 166 F.3d 1209 (table), 1999 WL 7860, at *4 (4th Cir. Jan. 11, 1999); *Jane v. Bowman Gray Sch. of Med.-N.C. Baptist Hosp.*, 211 F. Supp. 2d 678, 690-91 (M.D.N.C. 2002).

To establish a prima facie case of discrimination under the *McDonnell Douglas* test in the context of a graduate program, a plaintiff must show that he: (1) is a member of a protected class; (2) was qualified for continued participation in the graduate program; (3) was treated differently from similarly situated students who were not members of the protected class; and (4) was dismissed from the program despite his qualifications. *See Middlebrooks*, 1999 WL 7860, at *5; *Elliott v. Del. State Univ.*, 879 F. Supp. 2d 438, 443 (D. Del. 2012). If the plaintiff establishes a prima facie case, the burden shifts to the defendant to provide a legitimate, nondiscriminatory reason for the adverse action. *Middlebrooks*, 1999 WL 7860, at *4. If the defendant provides such evidence, "the burden shifts back to the plaintiff to show that the proffered reason is a pretext [for] discrimination." *Id.*

Mr. Maisha contends that UNC discriminated against him based on his race and national origin when: (1) UNC refused to let him take BIOS 994, dropped him from the course, and then dismissed him from the DrPH program; (2) Professors Fine and Hudgens submitted a paper for publication without listing Mr. Maisha as a co-author; and (3) the Professors gave datasets to a white student and prevented Mr. Maisha from using them. (*See* Doc. 64 at 17, 23-28.) Finally, Mr. Maisha asserts that UNC dismissed him from the program in retaliation for filing complaints. (Doc. 64 at 29-30.)

7

A. BIOS 994 and the DrPH Program

Mr. Maisha has produced no direct evidence connecting the decisions to drop him from BIOS 994 and terminate his enrollment in the DrPH program to his race or national origin. He has presented no admissible evidence of statements by any professor or administrator indicating bias or prejudice against persons of Mr. Maisha's race or national origin.[5] His personal belief that these events were motivated by discrimination is insufficient. *See Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 62 (4th Cir. 1995) (noting that the "mere incantation" of discriminatory intent does not "operate as a talisman" to defeat summary judgment).

Mr. Maisha has also failed on two fronts to establish a prima facie case of discrimination under *McDonnell Douglas*. First, Mr. Maisha has not shown he was qualified for continued participation in the program. *See Middlebrooks*, 1999 WL 7860, at *5. In the face of detailed affidavits from several witnesses about Mr. Maisha's failure to comply with the program's requirements, Mr. Maisha has proffered only his own opinion that he was qualified for continued enrollment. *See Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 960-61 (4th Cir. 1996) (holding that it is "the perception of the decision maker" that is relevant, not the self-assessment of the plaintiff.)

---

[5] He cites only two comments indirectly related to his national origin. (*See* Doc. 53-1 at p. 19 ¶ 45; Doc. 65-1 at 4.) One comment is inadmissible because Mr. Maisha did not disclose it when specifically asked to detail ways UNC officials discriminated against him. (*See* Doc. 72 at 2-3, 5.) The other comment was made in 2004, (Doc. 65-1 at 4), which is outside the statute of limitations. (*See* Doc. 25 at 3.) In any event, stray and isolated remarks not made in the context of negative treatment are insufficient to show discrimination. *See Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 608 (4th Cir. 1999).

Mr. Maisha contends that it was improper for UNC to require him to stop his dissertation research in 2010 when he still had two years to pass the Qualifying Exam. (Doc. 64 at 23, 28; *see* Doc. 43-24 at 198-200.)  However, nothing about UNC's extension to take the Qualifying Exam gave Mr. Maisha the right to ignore other requirements, such as the requirement that he pass the Qualifying Exam before enrolling in dissertation-level classes or starting formal dissertation research, or that he enroll in enough credit hours.  (*See* Doc. 43-16 at 27; Doc. 43-24 at 198-200.)

While professors and administrators granted Mr. Maisha exceptions to some of the usual rules in an effort to maintain his progress through the DrPH program, this does not obligate UNC to excuse Mr. Maisha forever from complying with its reasonable rules designed to move students toward completing their degrees.  Nor does it mean that Mr. Maisha could ignore the program's requirements in favor of his own preferred timetable.  Mr. Maisha's own opinions about how the DrPH program should work are irrelevant; it is the perception of the decision makers that matters.  *See Evans*, 80 F.3d at 960-61.

The evidence is undisputed that Mr. Maisha repeatedly attempted to enroll in BIOS 994 even though he was not eligible, that UNC officials repeatedly told him this was improper and offered to speak with him about his courses, that for over a year Mr. Maisha did not enroll in any UNC courses he was qualified to take, (*see* Doc. 43-21 at 3), and that Mr. Maisha's failure to enroll in proper courses resulted in his dismissal from the program.  Thus, Mr. Maisha was not qualified for continued participation in the DrPH program, and his Title VI claim fails.  *See Middlebrooks*, 1999 WL 7860, at *5; *see also*

*Davis v. Univ. of N.C.*, 263 F.3d 95, 102 (4th Cir. 2001) ("[Courts] generally accord great deference to a school's determination of the qualifications of a hopeful student.").

Second, Mr. Maisha has presented no evidence that he was treated differently from similarly situated students. *See Elliott*, 879 F. Supp. 2d at 443; *Ratliff v. Wake Forest Baptist Med. Ctr.*, No. 1:13CV991, 2014 WL 197809, at *2 (M.D.N.C. Jan. 14, 2014) (opinion of Auld, M.J.), *appeal dismissed*, 570 F. App'x 282 (4th Cir. 2014) (mem.). He has identified no student who was allowed to conduct formal dissertation research or register for dissertation-level courses without first passing the Qualifying Exam or without permission from the professor. He has identified no student who was not enrolled in enough credit hours, yet was allowed to continue in the program.

Mr. Maisha contends that a white student, L.L., "was permitted to sit for [the Preliminary Exam] in October of 2011, without successfully passing the [Qualifying Exam]."[6] (Doc. 64 at 12.) Mr. Maisha only cites his amended complaint in support, (*see* Doc. 64 at 12), and that is not evidence. *Higgins*, 837 F.2d at 156-57. Moreover, L.L. testified to passing the Qualifying Exam in 2007 and taking the Preliminary Exam in 2010. (Doc. 60-1 at ¶¶ 5-7.) Mr. Maisha has not presented evidence that gives rise to a genuine issue of fact that UNC treated similarly situated students of different races or national origins differently, and his Title VI claim fails. *See Carr v. Bd. of Regents of Univ. Sys. of Ga.*, 249 F. App'x 146, 149-50 (11th Cir. 2007) (affirming summary

---

[6] Students must pass the Qualifying Exam before taking the Preliminary Exam. (Doc. 43-1 at ¶¶ 33-34; Doc. 43-24 at 153-54; Doc. 43-25 at 8-9.)

judgment for the defendant because none of the plaintiff's proffered student-comparators had her same disciplinary history).

    B.  <u>The Fine/Hudgens Research Paper</u>

Mr. Maisha contends that UNC discriminated against him when Professors Fine and Hudgens submitted a research paper for publication without listing him as a co-author. (Doc. 64 at 17.) Mr. Maisha contributed to Professor Fine's HIV research from approximately the fall of 2008 to the summer of 2010. (Doc. 43-5 at ¶¶ 12-18; Doc. 43-7 at ¶¶ 8-9, 15-16.) In July 2010, Professors Fine and Hudgens submitted a research paper to a journal and listed Mr. Maisha as a co-author. (Doc. 43-7 at ¶ 17; Doc. 43-18 at 31.) In September 2010, the journal's editors rejected the paper but indicated they would consider a revised version. (Doc. 43-5 at ¶ 30; Doc. 43-19 at 4, 8.)

Starting in October 2010, the Professors, along with Dr. L., a post-doctoral researcher, and S.L., a graduate student, worked on revisions; Mr. Maisha did not assist. (Doc. 43-5 at ¶ 32; Doc. 43-7 at ¶ 34; Doc. 43-18 at 77.) The professors submitted the revised paper in November 2011, (Doc. 43-5 at ¶ 33; Doc. 43-7 at ¶ 35); they listed Dr. L. as a co-author and credited Mr. Maisha and S.L. in the acknowledgements. (Doc. 43-18 at 57, 77.) In March 2012, Professor Fine contacted Mr. Maisha to discuss authorship of the yet unpublished revised paper, (Doc. 43-7 at ¶ 39; Doc. 43-19 at 11), but Mr. Maisha never responded. (Doc. 43-7 at ¶ 39.) The paper was published in March 2014. (Doc. 43-5 at ¶ 37; Doc. 43-7 at ¶ 39; Doc. 43-18 at 98.)

Mr. Maisha has offered no evidence that the professors' decision to list him in the acknowledgements rather than as a co-author was based on discriminatory animus. As

noted, he has produced no direct evidence that either professor was biased against persons of his race or national origin. Nor has he established a prima facie case of discrimination, as he has failed to present any evidence beyond his own opinion that his work on the revised paper was sufficient to justify listing him as a co-author, and he has presented no evidence of another student in a similar circumstance who was listed as a co-author. Finally, he has not rebutted the Professors' explanations, who testified that: (1) "[t]he revised paper contained a significant amount of new material that [Mr. Maisha] had not worked on," (Doc. 43-5 at ¶ 34; Doc. 43-7 at ¶ 36); (2) Dr. L. made "key theoretical insights that served as underpinnings of the revision," (Doc. 43-5 at ¶ 32; Doc. 43-7 at ¶ 34); and (3) the revised paper was nearly fifty percent longer, with twelve pages of new material. (Doc. 43-5 at ¶ 34(h); Doc. 43-7 at ¶ 36(h).) A UNC review panel also found that the decision "not to list [Mr. Maisha] as a co-author on [the revised paper] appear[ed] to be an unbiased one based on the use of reasonable professional criteria." (Doc. 43-26 at 15.)

    C. <u>Access to Research Data</u>

Mr. Maisha contends that UNC "refused to supply [him] with research data like other similarly situated students, beginning in the fall of 2010 and continuing through January of 2012." (Doc. 64 at 23.) In support, he cites Plaintiff's Exhibit 1, (*see* Doc. 64 at 23), which is a 2008 letter to his attorney from UNC's attorney. (*See* Doc. 53-1 at 1-2.) That letter does not include any evidence that UNC or any professor withheld any research data from Mr. Maisha or provided data to other students, and does not even mention Mr. Maisha's claims to that effect. (*See* Doc. 53-1 at 1-2.) The Court is not

required to scour the record to develop and find support for this argument, which Mr. Maisha makes only in passing. *See Ritchie*, 242 F.3d at 723.

D. Retaliation

Mr. Maisha also asserts a retaliation claim under Title VI, contending that UNC's adverse actions against him were in retaliation to complaints he filed against the Biostatistics Department between 2006 and 2011. (Doc. 64 at 29-30.) He has produced no evidence of a causal connection between his complaints and UNC's actions. *See Peters v. Jenney*, 327 F.3d 307, 320 & n.15 (4th Cir. 2003) (listing the elements of a Title VI retaliation claim). To the contrary, the undisputed evidence shows that professors gave Mr. Maisha multiple chances to take the Qualifying Exam and offered to help him prepare for that exam many times. They warned him that he might lose his graduate-student status if he did not enroll in appropriate courses or take the Exam. Despite this, Mr. Maisha did not consult his professors about how to continue his studies at UNC, did not enroll in classes he was authorized to take, and did not take the Exam. Instead, he enrolled full-time in a graduate program at another university. There is no evidence of retaliation.

E. Conclusion

Title VI does not require UNC to run its graduate programs in a way that Mr. Maisha or any other student would prefer. Mr. Maisha's opinion that UNC made decisions about when he should take the Qualifying Exam, who should get authorship credit on research papers, whether he should be allowed to enroll in dissertation-level research courses, and his dismissal from the program because of his race or national

origin are not supported by any admissible evidence and do not give rise to a disputed question of material fact in his Title VI claim.[7]

Mr. Maisha's claims boil down to contentions that he was treated unfairly, irrationally, and unjustly; that he was the victim of academic politics, professional disputes, and miscommunications; and that UNC required compliance with policies he did not like. Title VI does not protect against these things, even assuming his contentions are true. Rather, Title VI protects covered students from illegal discrimination. Mr. Maisha has not shown that here, and his Title VI claim fails.

## II.   Section 1983 Claims

It is unclear what constitutional right Mr. Maisha claims Professors Fine and Hudgens violated, but it appears to be a substantive due process right and perhaps a property right in his research.[8] (Doc. 64 at 33-34.) To bring a due process claim, a plaintiff must first show that he was deprived of a constitutionally protected interest,

---

[7] Even assuming Mr. Maisha made out a prima facie case of discrimination, UNC has offered legitimate, nondiscriminatory reasons for its actions against Mr. Maisha, namely his failure to meet program qualifications or make meaningful contributions to the revised paper, and Mr. Maisha has offered no evidence that these reasons are a pretext. *See Villanueva v. Wellesley Coll.*, 930 F.2d 124, 129 (1st Cir. 1991) (requiring a plaintiff prove the defendant's proffered reasons are "obviously weak or implausible" or that the defendant's standards were "manifestly unequally applied"), *cert. denied*, 502 U.S. 861 (1991); *see also Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 225 (1985) (noting that judges should show "great respect for the faculty's professional judgment" when reviewing "a genuinely academic decision").

[8] Mr. Maisha says he "asserts both a due process claim and an equal protection claim." (Doc. 64 at 31.) But his brief does not clearly distinguish these claims and focuses mainly on his property interests in his research. (*See* Doc. 64 at 31-34.) Nonetheless, any equal protection claim fails because Mr. Maisha has not shown that he was treated differently from other similarly situated individuals as a result of intentional discrimination. *See Veney v. Wyche*, 293 F.3d 726, 730-31 (4th Cir. 2002); *see also* discussion *supra*.

14

which is something to which a plaintiff has "a legitimate claim of entitlement" rather than "an abstract need or desire" or "a unilateral expectation." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 569, 577 (1972).

Mr. Maisha contends that Professors Fine and Hudgens violated his due process rights by "refusing to provide him with . . . data for his dissertation research," (Doc. 64 at 31), and by "turn[ing] [his] work over to a white male student for him to complete as his own." (Doc. 64 at 33.) He cites nothing in the record to support these assertions, and the Court is not required to scour the record. *See Ritchie*, 242 F.3d at 723. He cites no cases for the proposition that the Constitution requires university professors to provide research data to students who are not on track to receive their degrees or to only allow one student to write about a certain topic or to use a large dataset.

Finally, Mr. Maisha contends that he had a protected interest "in being an advisee and lead author on the paper Professors Fine and Hudgens published without him." (Doc. 64 at 34.) He cites no case for the proposition that the Constitution requires university professors to work with students who do not comply with university rules or that a professor must list a student as a co-author on a research paper when the student did not work on significant revisions to the paper.

Even assuming Mr. Maisha had a protected interest at stake, the Professors' decisions do not appear to be "such a substantial departure from accepted academic norms as to demonstrate that [they] did not exercise professional judgment." *Regents of*

*Univ. of Mich. v. Ewing*, 474 U.S. 214, 227 (1985).[9]  For these reasons, the Court will grant the defendants' motion for summary judgment as to Mr. Maisha's § 1983 claims.

### III. Emotional Distress Claims

Mr. Maisha asserts claims for intentional and negligent infliction of emotional distress against Professors Fine and Hudgens in their individual capacities.  (Doc. 14 at ¶¶ 192-200; Doc. 64 at 34-40.)  For both claims, a plaintiff must prove the defendant's actions caused severe emotional distress.  *See Waddle v. Sparks*, 331 N.C. 73, 82, 414 S.E.2d 22, 27 (1992) (listing the elements of an IIED claim); *Johnson v. Ruark Obstetrics & Gynecology Assocs., P.A.*, 327 N.C. 283, 304, 395 S.E.2d 85, 97 (1990) (listing the elements of an NIED claim).  "Severe emotional distress" means "any . . . type of severe and disabling emotional or mental condition [that] may be generally recognized and diagnosed by professionals trained to do so."  *Johnson*, 327 N.C. at 304, 395 S.E.2d at 97; *see also Waddle*, 331 N.C. at 83, 414 S.E.2d at 27 (adopting this definition for IIED).

Mr. Maisha has produced no evidence that he suffered serious emotional distress to the extent required under North Carolina law.  *See Waddle*, 331 N.C. at 83-84, 414 S.E.2d at 27-28 (requiring a "high standard of proof" of severe emotional distress).  From August 2010 to July 2013, Mr. Maisha was enrolled and employed full-time at the University of Oslo.  (Doc. 43-10 at ¶¶ 3-4; *see also* Doc. 53-1 at p. 27 ¶¶ 100-03; Doc.

---

[9] Moreover, § 1983 due process claims are analyzed under the *McDonnell Douglas* framework.  *McCray v. Pee Dee Reg'l Transp. Auth.*, 263 F. App'x 301, 305 (4th Cir. 2008), *cert. denied*, 554 U.S. 918 (2008).  As discussed *supra*, Mr. Maisha has presented no direct evidence of discrimination and cannot establish a prima facie case of discrimination, and Professors Fine and Hudgens provided legitimate, nondiscriminatory reasons for their actions.

16

57-3 at 4-5.) Even though his compensation included health benefits, (Doc. 43-10 at ¶ 4; *but see* Doc. 43-15 at 7), Mr. Maisha never sought or received medical treatment or a diagnosis from a psychiatrist or psychologist and produced no medical records to support his claim of severe emotional distress. *See Waddle*, 331 N.C. at 85, 414 S.E.2d at 28; (Doc. 43-15 at 7-8.) There is no evidence he ever took any medicine for his distress, *cf. Waddle*, 331 N.C. at 85, 414 S.E.2d at 28, or that he suffered from disabling psychological problems. *See id.* While "[p]roof of severe emotional distress does not necessarily require medical evidence or testimony," there must be "real evidence of severe emotional distress." *Pacheco v. Rogers & Breece, Inc.*, 157 N.C. App. 445, 450, 579 S.E.2d 505, 508 (2003) (internal quotation marks omitted).

While Mr. Maisha has presented evidence that he had some anxiety and trouble sleeping, (Doc. 53-1 at p. 14 ¶ 18, p. 23 ¶ 70), that alone does not qualify as severe emotional distress. *See Johnson v. Scott*, 137 N.C. App. 534, 539-40, 528 S.E.2d 402, 405 (2000). Nor does his evidence that he was under stress rise to the level of "severe emotional distress" as defined by North Carolina law. *See, e.g.*, *Estate of Hendrickson ex rel. Hendrickson v. Genesis Health Venture, Inc.*, 151 N.C. App. 139, 156-57, 565 S.E.2d 254, 265 (2002) (holding that the trial court erred in denying the defendant's directed verdict where the plaintiff presented evidence that she had nightmares and trouble sleeping, but did not take time off work due to emotional problems), *disc. rev. denied*, 356 N.C. 299, 570 S.E.2d 504 (2002) (mem.); *Fox-Kirk v. Hannon*, 142 N.C App. 267, 282, 542 S.E.2d 346, 356 (2001) (affirming summary judgment for the defendant where the plaintiff had not sought or received medical treatment or diagnosis in the two years

17

since the accident), *disc. rev. denied*, 353 N.C. 725, 551 S.E.2d 437 (2001) (mem.); *Johnson*, 137 N.C. App. at 539-40, 528 S.E.2d at 405 (affirming summary judgment for the defendant where the plaintiffs presented evidence that they had nightmares and trouble sleeping, but neither was diagnosed by a doctor as suffering from a severe mental condition). In the absence of any evidence to support them, Mr. Maisha's emotional distress claims fail.[10]

## IV.   UNC's Counterclaim

UNC has also filed a motion for summary judgment on its counterclaim against Mr. Maisha for money had and received. (Doc. 46.) The Court has not yet considered the merits of this motion, which will remain under advisement. In the meantime, the case is removed from the April 2015 trial calendar. If the parties have not yet mediated, now is a good time. If they have mediated, the Court directs counsel to confer about whether they might agree to a consent resolution to this counterclaim.

---

[10] The Court struck testimony from three witnesses who purported to diagnose Mr. Maisha with depression and anxiety-related disorders for various reasons, as set forth in a separate Order. (Doc. 72 at 8-10, 12-15.) Moreover, the cases cited in Mr. Maisha's brief indicate that perhaps his counsel misapprehends the difference between a motion to dismiss and a motion for summary judgment. Throughout his discussion of the emotional distress claims, counsel repeatedly cites North Carolina cases concluding that a plaintiff stated a claim for relief. (*See* Doc. 64 at 38-39 (citing *Barbier v. Durham Cnty. Bd. of Educ.*, 225 F. Supp. 2d 617 (M.D.N.C. 2002), *McAllister v. Ha*, 347 N.C. 638, 496 S.E.2d 577 (1998), *Acosta v. Byrum*, 180 N.C. App. 562, 638 S.E.2d 246 (2006), and *Johnson v. First Union Corp.*, 128 N.C. App. 450, 496 S.E.2d 1 (1998)).) To defeat a motion for summary judgment, however, the non-moving party must present more than "mere speculation or the building of one inference upon another," *Othentec Ltd. v. Phelan*, 526 F.3d 135, 140 (4th Cir. 2008), and the Court has the "affirmative obligation" to "prevent factually unsupported claims and defenses from proceeding to trial." *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (internal quotation marks omitted).

To be clear, the Court does not require the parties to agree to anything and is merely directing them to explore the possibility. If the parties do resolve the counterclaim while the summary judgment motion is under advisement, they are directed to promptly advise the Court. Otherwise, the Court will enter an order as time permits.

V. **Conclusion**

Because Mr. Maisha has presented no admissible evidence of discrimination and has not established a prima facie case of discrimination, and because he has not presented sufficient evidence of severe emotional distress, the Court will grant the defendants' motion for summary judgment as to all of Mr. Maisha's remaining claims.

It is **ORDERED** that:

1. The defendants' motion for summary judgment as to the plaintiff's claims, (Doc. 43), is **GRANTED**.

2. The exhibits Mr. Maisha filed with his substitute brief at Docket 64-1 are **STRICKEN** from the record.

3. In view of the substitute brief at Docket 64 and the rules violations in the original brief at Docket 53, the original brief at Docket 53 is **STRICKEN** from the record.

4. The motion for summary judgment as to the defendants' counterclaim, (Doc. 46), remains under advisement.

This the 22nd day of January, 2015.

_____
UNITED STATES DISTRICT JUDGE